# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THOMAS O'TOOLE,

          Plaintiff,

          v.

R. ALEXANDER ACOSTA, Secretary of
Labor,[1]

          Defendant.

Case No. 14-cv-2467

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Thomas O'Toole sued his former employer, the Department of Labor (DOL), for alleged violations of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*., and for alleged spoliation of evidence under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq*. [33]. Defendant moved for summary judgment [95], and Plaintiff cross-filed for partial summary judgment, [104]. For the reasons explained below, this Court denies Plaintiff's motion and grants Defendant's motion.

## I.    Background

### A.    Local Rule 56.1 and Evidentiary Issues

The facts in this discussion come from the parties' Local Rule 56.1 statements of material fact.[2] Defendant asks this Court to deem a number of its statements of fact admitted as a result of Plaintiff's inadequate responses. [111] at 2–3. This

---

[1] R. Alexander Acosta is now the Secretary of Labor and has been substituted as a party with respect to Plaintiff's Rehabilitation Act claims pursuant to Federal Rule of Civil Procedure 25(d).

[2] In this discussion, DSOF refers to Defendant's statement of facts [97], with Plaintiff's responses [106] cited as R. DSOF. PSAF refers to Plaintiff's statement of additional facts, [106] at 60, with Defendants' responses [112] cited as R. PSAF. References to other filings use docket numbers.

Court has broad discretion to enforce the local rules governing summary judgment motions. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Under those rules, simply denying a fact that has evidentiary support "does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment," and this Court may disregard improper denials. *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015) (citation omitted); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Thus, purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements. *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012); *Malec*, 191 F.R.D. at 584; *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (applying Rule 56 under its prior designation as Rule 12). A proper denial must "cite specific evidentiary materials justifying the denial." *Malec*, 191 F.R.D. at 584.

Here, this Court takes into account Plaintiff's pro se status. Pro se plaintiffs normally receive "flexible treatment," but that courtesy does not extend to "*pro se* litigants who are attorneys." *See Cole v. C.I.R.*, 637 F.3d 767, 773 (7th Cir. 2011). Plaintiff admits that he is a licensed attorney in Ohio. R. DSOF ¶ 53. Moreover, even pro se litigants "must follow the rules of civil procedure," *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)), and district courts may strictly enforce them, particularly where the litigant received an explanation of the relevant rule, *see id.*; *Coleman v. Goodwill*

*Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011). Plaintiff received an explanation of the summary judgment procedures here. *See* [98].

Accordingly, this Court disregards the following denials from Plaintiff's response to Defendant's statement of facts:

- Paragraphs 14, 17, 18, 20, 21, 25, 26, 28–30, 40, 43, 44, 46–48, 49, 52, 53, 56–61, 67–71, 73, 74, and 76–80 for failing to cite to record evidence;
- Paragraphs 4, 5, 12, 33, 34, and 35, with respect to those portions of the denials that do not cite any record evidence;
- Paragraphs 3, 7, 8–11, 15, 16, 22–24, 31, 36, 37, 41, 42, 50, 54, 62, 64, 66, and 72 for failing to cite record evidence that actually or clearly rebuts the corresponding statement of fact, and which lack any clarifying explanation;
- The portions of paragraph 38 that speculate as to Autumn Nguyen's state of mind; and
- Paragraph 45 for failing to cite record evidence that supports the denial, except with respect to Nguyen's revisions of one of Plaintiff's performance appraisals in February 2013.

*See Phillips, LLC*, 855 F. Supp. 2d at 771 (disregarding denials that lacked record support or were not based upon personal knowledge); *Malec*, 191 F.R.D. at 584 (If material cited to support a denial "does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation."). Defendant's corresponding statements of fact are deemed admitted. *See Phillips, LLC*, 855 F. Supp. 2d at 771.

As an exercise of discretion, this Court declines to strike Plaintiff's statement of additional facts wholesale for Plaintiff's failure to separate his additional facts from his response to Defendant's statement of facts, in accordance with this Court's local rules. *See* [106] at 60; Local R. 56.1(b)(3)(C). But those statements of fact must still contain "specific references to the record" and rest upon admissible evidence. *Malec*, 191 F.R.D. at 584, 585; *see also Gunville v. Walker*, 583 F.3d 979,

985 (7th Cir. 2009) (courts "consider only admissible evidence" at summary judgment). Accordingly, this Court strikes the following statements of additional facts: the second half of paragraph 81, which lacks citation to the record; paragraph 83, because the cited material does not support the statement; and paragraph 84 (misnumbered 85) for the same reason. *See* [106] at 60.

## B. Employment Expectations

Plaintiff worked for DOL's Bureau of Labor Statistics (BLS) as a statistician from February 2012 to August 2014. DSOF ¶¶ 1, 75; R. DSOF ¶ 1; [33] ¶ 10. Plaintiff has Type 2 diabetes, which he disclosed on his first day of work. DSOF ¶ 2; [107] at 7. Plaintiff admits that he did not then request an accommodation for his disability, but states that within his first few days at BLS he discussed his need to take consistently timed meals with his supervisor, Autumn Nguyen. DSOF ¶ 1; [107] at 7. Given the circumstances, Plaintiff and Nguyen foresaw no reason that this would pose a problem, especially in light of Plaintiff's schedule and right to a lunch break. [107] at 7; [97-12] at 3.

Plaintiff worked in BLS' Chicago Regional Office, starting at the GS-12 government pay grade. DSOF ¶ 1; [107] at 6. BLS assigned him to its Division of Price Programs, which collects data for the Producer Price Index (PPI). DSOF ¶ 1; [107] at 6. Plaintiff's job as a field statistician required him to visit private businesses, secure their agreement to provide data on their products for inclusion in the PPI, and obtain additional information on those products from buyers. DSOF ¶ 3; [107] at 6. After Plaintiff collected that information, he had to submit it to the BLS office in Washington, D.C., in the form of written "schedules" containing

information on the businesses, goods, and pricing. DSOF ¶ 3. These schedules needed to meet BLS' internal deadlines and quality parameters. *Id*. Plaintiff's Performance Management Plan—which he signed on his first day—evaluated his work with respect to four "result elements": collecting quality data, collecting data efficiently, timely collecting and submitting data, and supporting DOL's mission. *See* [97-7] at 2–6.[3]

To meet with businesses and collect data, statisticians like Plaintiff were required to travel within their regions. DSOF ¶ 4; [97-5] at 17; [97-2] at 6, 8. The position description does not specify that the job involves interstate travel, but does state that travel is "extensive," frequent, and that the job requires the ability to drive. [97-2] at 8.

The statistician position also incorporated a lengthy certification process. DSOF ¶ 5. New hires attended a course in Washington, D.C., and had to pass a written test. *Id*. ¶ 6; [107] at 8. Next, statisticians like Plaintiff participated in on-the-job training (OJT), which involved shadowing a mentor, conducting appointments under the mentor's observation, observing the mentor's data collection, and collecting "at least four productive schedules" under observation. DSOF ¶ 7; [107] at 8. If these schedules were completed successfully, a statistician could receive "interim certification," permitting them to collect data independently,

---

[3] Plaintiff claims that Defendant altered this performance plan after he signed it. *See* R. DSOF ¶ 4. It is clear, however, that Defendant "altered" the plan in part because BLS uses the same form for midterm and annual evaluations—in other words, the form that Plaintiff signed on his first day left room for subsequent evaluations. *See* [97-7] at 4–6. Additionally, Plaintiff offers no evidence to rebut Nguyen's testimony that she edited the narrative on one of his appraisals *in response to his written comments*, [97-23] at 23, and that one of the original "result elements" (performance criteria) was eliminated as a metric for all BLS economists, *see* [97-5] at 22.

though a more senior BLS employee would still fully review any work they produced ("100% review"). DSOF ¶ 7; [97-8] at 20. Once statisticians began independent data collection, they had to successfully complete additional schedules to receive final certification. *See* DSOF ¶ 8; [97-8] at 20–21. If five *consecutive* schedules met the quality parameters, the statistician could move from 100% review to 10% review. DSOF ¶ 8. This phase ordinarily took two to four months. [97-8] at 21. The final step before certification required statisticians to complete two interviews with businesses while observed by their mentor, and have the data for five schedules verified by a more senior BLS employee. *See* DSOF ¶ 9.

All BLS employees had to record their hours worked in PeopleTime, DOL's timekeeping software, and submit reports itemizing how they spent those hours. *Id*. ¶ 10. BLS employees could work different schedules, including the "fixed" schedule—five, eight-hour days with a 30-minute unpaid lunch break—and the "flexible" or "variable" schedule, which permitted employees to vary their hours as long as they completed eighty hours each biweekly pay period. *Id*. ¶ 11; [107] at 46 (union agreement for DOL employees). Either schedule entitled employees to a 30-minute lunch break and two 15-minute breaks per day. *See* [97-12] at 3; [107] at 47. Employees on the variable schedule also needed to sign in and out of the office each day. DSOF ¶ 11; [107] at 51–52.

Plaintiff states that when he started at BLS, Nguyen told him that he had to work a "fixed schedule." [107] at 15. Plaintiff admits, however, that union rules show that employees could opt out of default schedules. *See* R. DSOF ¶ 11 The

parties dispute the evidence as to Plaintiff's schedule, and compliance with these rules, as discussed below.

## C.    Plaintiff's Initial Performance

Plaintiff successfully completed the price certification training course and exam in March 2012. DSOF ¶ 13. At this point, Sharon Isaac, a senior economist based in BLS' Milwaukee office, became Plaintiff's OJT mentor. *See id.*; [97-9] at 2. Plaintiff also received observational mentoring from Mary Marcotte, a senior statistician in BLS' Minneapolis office. *See* DSOF ¶ 13; [97-21] at 4, 13–14.

By late April 2012, Nguyen began sending emails to check on Plaintiff's progress collecting data. *See* DSOF ¶ 14. Plaintiff had successfully submitted three productive schedules in March but only two in April, of which only one was evaluated as "successfully completed." *Id.* ¶¶ 17–18. As Nguyen reminded Plaintiff in May, statisticians like Plaintiff—who now collected data independently—were expected to collect three to four schedules a week, and to transmit twelve every month, of which ten had to be "productive." *See* [97-10] at 37; [97-17] at 3.

On May 1, Nguyen wrote to Isaac, Plaintiff's mentor, requesting an update on Plaintiff's schedules and asking "why has it taken so long?" [97-16] at 2. That particular inquiry appears to relate to four schedules for which Plaintiff and Isaac collected data in March, and in this case at least part of the delay resulted from a technical glitch that deleted data from some of Plaintiff's schedules. *See id.*; [107-2] at 79. Through May, however, Nguyen continued to follow up with Plaintiff on outstanding schedules and his progress securing appointments with businesses. *See* DSOF ¶¶ 15–17; [97-17]. She encouraged him to reach out to Isaac for help as

often as he needed. [97-17] at 3. As of May 24, a number of Plaintiff's schedules remained incomplete "over a month" after he should have submitted them. *Id*. at 5. On May 31, Nguyen provided an in-office training session on securing appointments, since Plaintiff had so few lined up. *See* DSOF ¶ 17; [97-18] at 3.

### D.    Plaintiff's Travel

Plaintiff alleges that Defendant forced him to travel or work through meals, despite Nguyen knowing that he had to take consistent meal breaks to manage his diabetes. *See* DSOF ¶ 19; [33] at 7–10. For example, Plaintiff claims that he did not have time to stop for meal breaks when driving to appointments in Wisconsin because of Nguyen's requirement that he conduct multiple interviews while traveling, and schedule them early in the morning. [107] at 7, 8. Plaintiff also complains of the additional constraint of needing to return his government car before the garage closed at 6:00 p.m., but he admits that once he raised the issue, Nguyen secured him a pass to access the garage outside regular hours, apparently by or around the end of June 2012. *See* [97-6] at 7; DSOF ¶ 20.

With respect to BLS' travel policy, general DOL guidelines indicate that, "when possible," business travel should take place during employees' normal hours. *See* [97-20] at 8. In April 2012, Nguyen also emailed Plaintiff and another statistician, Kent Rupp, a set of guidelines on efficiently scheduling appointments, which included different recommendations for local and overnight travel. [97-19]. For example, the guidelines recommend that statisticians schedule at least one appointment on travel days, and at least two on non-travel days during a multi-day trip. *Id*. at 8.

Plaintiff points to a trip in June 2012 that he claims caused him to lose control of his diabetes by missing meals. *See* [107] at 12–13. From June 5–7, Plaintiff traveled to Minnesota to interview businesses under Marcotte's supervision. DSOF ¶ 21. Plaintiff testified that because of the time spent traveling and the number of appointments scheduled for that trip, he missed lunch on June 5, breakfast on June 6, and ate a late dinner on June 6. *Id.*; [97-10] at 5; [97-6] at 6–7. But Plaintiff also testified that he never told Marcotte about his diabetes for fear that she would "gossip." DSOF ¶ 22; [97-6] at 7.

On June 6, Marcotte told Plaintiff that they now had a second interview on June 7, in addition to the single interview already scheduled. DSOF ¶ 23. To accommodate the extra interview, Marcotte told Plaintiff to reschedule his early afternoon return flight. *Id.* Plaintiff believed that this schedule would force him to work through lunch and dinner, due to the extra appointment and travel time. *Id.* ¶ 24. He told Marcotte he could not take on the appointment, but did not explain why. *Id.* Marcotte did not know at this point that Plaintiff had diabetes or felt unwell. *Id.* According to Plaintiff, Nguyen intervened and told him he was "ordered to do it, and would be disciplined" if he did not. *Id.* ¶ 25. Plaintiff testified that he left Nguyen voicemail messages stating that he "couldn't do this," and that Nguyen would know what he meant. *Id.*

Unable to reach Nguyen, Plaintiff tried to rebook his return flight for later in the day on June 7. *Id.* ¶ 26. Not finding any available government contract flights, Plaintiff booked a return flight on Friday, June 8. *Id.* Later that night, Nguyen

texted Plaintiff to let him know that she had secured a non-contract return flight at 4:00 p.m. on June 7, and instructed him to cancel the June 8 flight. *Id.* On June 7, Plaintiff missed lunch and dinner, allegedly as a result of keeping the two interviews and then taking the 4:00 p.m. flight, which did not have meal service. *Id.* ¶ 27. In the following week, and for the next two months, Plaintiff experienced pain and numbness in his feet and blurred vision. *Id.*; [107] at 13. His doctor prescribed insulin and told him to maintain "a regular eating pattern." DSOF ¶ 27. Currently, Plaintiff is insulin-dependent. [107] at 25.

### E.     Request for Accommodation

On June 18, 2012, Plaintiff submitted an accommodation request, specifying that he required three half-hour meal breaks: one between 6:00 and 7:00 a.m., one between 11:30 a.m. and 2:00 p.m., and one between 5:30 and 6:30 p.m. DSOF ¶ 28. Plaintiff also requested advance notice of any travel—and its duration—to enable him to bring appropriate medication. *Id.* On June 29, Nguyen denied Plaintiff's request. *Id.* ¶ 29. She pointed out that as a union employee, he already had the right to a 30-minute lunch break at the requested time, and two 15-minute rest breaks; further, Plaintiff made his own schedule and it was his responsibility to take lunch and plan for his own travel. *Id.*

On July 6, Plaintiff filed a union grievance, alleging that Nguyen violated his right to a meal break and citing the second interview on June 7 as the basis for his grievance. *Id.* ¶ 30; [97-26] at 2. Plaintiff, Nguyen, and Plaintiff's union representative participated in an investigative meeting on August 3; on August 14,

Nguyen denied the grievance, stating that Plaintiff had not requested a lunch break on June 7, and that, in any event, it was his own responsibility to take a lunch break. [97-27] at 2–4. Despite finding no violations of the union's agreement with DOL, Nguyen agreed to follow the recommendation of Plaintiff's union representative and "assist" him "in planning trips and appointments" around meal times. *Id.* at 4. Plaintiff does not allege that he missed any other meals following this accommodation request and grievance process. *See* DSOF ¶ 31; [107] 5–29.

In August 2012, Plaintiff filed a complaint with DOL's Civil Rights Center (CRC), alleging disability discrimination because of Nguyen's denial of his accommodation request. DSOF ¶ 31. In November, Nguyen agreed to the following accommodations: (1) no supervisor or mentor would make an appointment during the 30-minute period that Plaintiff identified as his lunch break; (2) if management officials directly assigned or scheduled trips, they would notify Plaintiff of the estimated duration; (3) management would consider assigning more local work; and (4) Plaintiff would give supervisors or mentors advance notice of when he planned to take his lunch. [97-28] at 2. The accommodation agreement noted, however, that these accommodations only applied "in the rare instance" that a supervisor or mentor arranged Plaintiff's travel or appointments; at all other times, Plaintiff had "the ability and responsibility" to make his own schedule and take his own breaks. *Id.* at 3. Plaintiff signed this agreement in December 2012. *Id.*

## F. Plaintiff's Performance After his Request for Accommodation

In June 2012—the same month that Plaintiff submitted his accommodation

request—Plaintiff completed only one productive schedule, which was evaluated as unsuccessful. DSOF ¶ 33; *see also* [97-9] at 3–4. Plaintiff points out that he received this evaluation after he requested an accommodation and filed a union grievance; he also claims—without evidentiary support—that the record of his completed schedules in his Industrial Price Certification Form reflects only his OJT schedules, and not his independently collected schedules. *See* R. DSOF ¶ 33. In a July 2012 email, Nguyen noted that Plaintiff only submitted three schedules for review from data collected in May and June; she reminded him that he needed to submit at least 10 productive schedules per month, and that he had to schedule 10 appointments for July to keep the expected pace. [97-30] at 2.

Around the same time, Nguyen came to believe that Plaintiff had misrepresented whether he had scheduled certain appointments in June. DSOF ¶ 34; [97-31] at 2. Nguyen had emailed Plaintiff just before his June trip to Minnesota instructing him to make certain appointments and later followed up to see if he had done so. DSOF ¶ 34; [97-31] at 2; [97-32] at 3–4. Plaintiff answered that he had scheduled two of the appointments they discussed and had "now left messages canceling them," claiming that they coincided with appointments scheduled with Marcotte. [97-32] at 2, 3. Nguyen responded that she spoke to Marcotte, who did not know that Plaintiff had any confirmed appointments, let alone any that conflicted with ones that she scheduled. *Id*. at 2. Marcotte followed up with the companies Plaintiff supposedly had appointments with, and learned that, in fact, he had merely left voicemails requesting meetings. DSOF ¶ 35.

Plaintiff admitted the truth of this matter during the August 3 investigatory interview relating to his union grievance. *Id.* Plaintiff now disputes his deception and the meaning of his email, and claims that Nguyen knew he did not mean that he had confirmed appointments. *See* [97-39] at 2–3; R. DSOF ¶ 34. He also points out that this incident occurred after he filed his accommodation request and grievance. R. DSOF ¶ 34.

In July 2012, Nguyen had repeated exchanges with Plaintiff about his recorded hours in PeopleTime. *See* DSOF ¶ 36. First, she instructed him to correct PeopleTime entries improperly claiming overtime, since he was exempt from the Fair Labor Standards Act (FLSA). *Id.* Instead, Plaintiff could claim compensatory time for certain extra travel or work hours. *Id.* ¶ 37. Despite these clear instructions, Plaintiff refused to amend his timesheet, so Nguyen was forced to make the changes herself and gave him 7.25 hours of "comp time." *Id.* In one email, Nguyen also noted that Plaintiff was not entitled to compensation for normal commuting time. [97-34] at 3. The rules Nguyen conveyed to Plaintiff accord with the guidance she provided to other BLS employees and with federal regulations. DSOF ¶ 36; [97-35]; *see also* 5 CFR § 550.1404.

In the course of these exchanges, Plaintiff indicated that he thought he had a flexible work schedule. DSOF ¶ 38. Nguyen believed he was on a fixed schedule, and testified that she understood that this was Plaintiff's preference when he began at BLS. *Id.* ¶¶ 12, 38. Plaintiff noted that his time sheets indicated a "variable workweek" schedule and Nguyen told him that this was an error from a recent

software upgrade; as a result of the error, *all* BLS employees were mistakenly listed as working a variable workweek. *Id.* ¶ 38. Plaintiff claims that Nguyen told him he had to be on a fixed schedule when he started, and denied him the opportunity to have a variable workweek schedule. R. DSOF ¶ 38; [107] at 15.

In any event, after these exchanges Nguyen moved Plaintiff to a variable schedule in August 2012.[4] *See* DSOF ¶ 39; [97-27] at 3; [97-11] at 8, 12; [97-37] at 2. She also sent him detailed instructions for recording his hours worked on the new schedule. DSOF ¶ 39. These instructions mirror those she provided to other BLS employees. *Id.* They included the fact that Plaintiff had to log his actual start and end times in PeopleTime to match the office sign-in and sign-out sheet. *Id.*; [97-37] at 2. Despite Nguyen's instructions, Plaintiff continued to falsely record a standard 8:00 a.m. to 4:30 p.m. schedule in PeopleTime, even though he really signed in and out at different times. DSOF ¶ 39.

As a result of these events, Nguyen issued Plaintiff a notice of a proposed one-day suspension on August 31. DSOF ¶ 40; [97-31] at 2. The stated grounds included lack of candor (because Plaintiff misrepresented his June appointments) and failure to follow instructions (because Plaintiff filled out his time sheets

---

[4] The change in Plaintiff's schedule relates to another of Plaintiff's claims. He contends that five "credit hours" disappeared from his PeopleTime profile in July or August 2012. *See* DSOF ¶ 63; [33] ¶ 41. Defendant notes that before August 2012, Plaintiff was not eligible for "credit hours" since he was on a "fixed" rather than a flexible schedule. DSOF ¶ 63; [97-12] at 3, 5 (DOL Personnel Regulations); [107] at 51 (union agreement). Plaintiff points to the fact that certain time sheets are labeled "amended" as evidence of tampering, *see* R. DSOF ¶¶ 63, 67; [97-36] at 18, 22–24, but these time sheets correspond to the occasions that Nguyen instructed Plaintiff to correct errors in his time sheets, *see* [97-31] at 3, [97-34]. Indeed, the amended versions include the comp time Nguyen granted Plaintiff when those corrections were made. *See* [97-34], [97-36] at 22–24. Plaintiff does not explain why he was entitled to "credit hours" while on a fixed schedule, other than to deny without support—and contrary to his sworn declaration—that he ever worked a fixed schedule. *See* R. DSOF ¶ 63; [107] at 15–16; *see also* DSOF ¶ 39; [97-11] at 8; [97-37] at 2.

improperly and failed to schedule any appointments in July). DSOF ¶ 40; [97-31] at 2–3. Plaintiff submitted a response claiming that Nguyen had misinterpreted his email about the June appointments, and that he had referred to "pushed interviews," in which BLS employees show up at businesses unannounced to try to secure impromptu meetings, rather than formally scheduled interviews. DSOF ¶ 41. Plaintiff also argued that the requirement that he make 10 appointments in July was not part of his performance plan but a goal for more "experienced field staff." *Id*. ¶ 42. He claimed that he could not set appointments in July because he had to write up past data, justify his payroll records to Nguyen, and because he could not drive due to his diabetes. *Id*. He supplemented these claims with a doctor's note—stating only that he required regularly scheduled meals—and a June 2012 prescription for insulin. *Id*. As to the time sheets, Plaintiff addressed the inconsistencies by claiming that he had deducted commute time. *Id*. ¶ 43.

On November 19, Bryan Droste, BLS' Assistant Regional Commissioner, issued a final decision affirming Plaintiff's suspension. *Id*. ¶ 44; [97-40]. Droste considered Plaintiff's response and exhibits; Droste found that Plaintiff's explanations were not credible, that Nguyen's instructions had been "abundantly clear," and that Plaintiff had never indicated—before this disciplinary action was taken—that he had any driving restrictions. DSOF ¶ 44. (Nor does Plaintiff offer such evidence now.)

While the suspension decision remained pending, Plaintiff received his performance evaluation for fiscal year 2012. *Id*. ¶ 45. His overall rating was

"minimally satisfactory" because his data was not high quality; he had transmitted few productive schedules; 80% of his submitted schedules contained errors; and he did not work efficiently, spending an average of 28.1 hours on each productive schedule, a rate 150% higher than BLS' regional standard of 14–19 hours per productive schedule (HPPS). *Id*. Finally, Plaintiff also failed to meet national and regional deadlines for transmitting his schedules. *Id*.

Plaintiff filed written objections to his evaluation, which Nguyen considered but which did not result in any change to his rating. *Id*. ¶ 46. Specifically, Plaintiff contested the validity of the metrics used, asserting that they did not match what he had learned in his initial training course, and argued that he could not produce more schedules because he spent so much time traveling. *Id*. Plaintiff now also contests the validity of the performance evaluation itself: he says that Nguyen "changed the narrative." R. DSOF ¶ 45. Nguyen admitted in her deposition that she adjusted some of her remarks, but stated that she only did so in response to Plaintiff's objections to the evaluation: following his complaint, she adjusted the number of appointments she had initially listed for him. [97-5] at 18. Plaintiff now agrees that these changes benefitted him, since he states that they removed "some of the misstatement [sic] of facts and omissions." R. DSOF ¶ 45. Plaintiff's overall rating did not change. DSOF ¶ 46.

Also in October 2012, Nguyen told Plaintiff that she had seen him breach BLS' confidentiality policy by leaving information relating to one business in plain view during an interview with a different company. *Id*. ¶ 64. Nguyen reported the

incident to her superior, as required by BLS rules, but took no further action at that time. *Id.* No discipline resulted nor was the breach cited in any performance review. *Id.* Plaintiff denies that he breached the confidentiality policy. *Id.*

In late October, Nguyen reviewed Plaintiff's time sheet from a recent trip to Minneapolis and noticed that his recorded start and end times in PeopleTime failed to match the times in his Outlook calendar. *Id.* ¶ 65; *see also* [97-61] at 6–8. In response to her request, Plaintiff provided his departure and arrival times for travel and appointments during the trip. [97-61] at 6–8. Upon reviewing these times, Nguyen told Plaintiff he should not have entered an 8:00 a.m. to 4:30 p.m. schedule in PeopleTime when he had actually worked varied hours. *Id.* at 6; DSOF ¶ 66. Moreover, Plaintiff could not claim "comp time for travel" for travel within the normal working hours of 6:00 a.m. to 7:00 p.m. while on a flexible schedule. *See* DSOF ¶ 66; [97-12] at 5; [107] at 52. Plaintiff first refused to correct his time sheets because it was "not worth the hassle." [97-61] at 4. When Nguyen reminded him that the union contract required accurately reporting hours worked, Plaintiff contested Nguyen's interpretation of DOL's timekeeping rules and refused to amend his time sheet. DSOF ¶ 67. According to Plaintiff, Nguyen then amended it herself and also converted Plaintiff's claimed "comp time" and sick time to used "credit hours," but did not restore the now-unused comp time and sick time. *Id.*

In December 2012, Nguyen called Plaintiff to her office to question him about his interviews with companies. *Id.* ¶ 68. She had concerns about inconsistencies in his written work and possible errors and unprofessional behavior. *Id.* Nguyen

spoke with Plaintiff for about an hour, but did not seek any discipline and the interview was not listed in Plaintiff's subsequent performance review. *Id.*

In February 2013, BLS denied Defendant a within-grade pay increase (WIGI) as a result of his poor 2012 performance evaluation. *Id.* ¶ 47; [97-42] at 3. Plaintiff exercised his right to contest the denial, arguing that the alleged errors in his work were based upon misinterpretations of BLS' data collection procedures and practices, that the practices of BLS' Chicago office did not match what he learned in his initial training course, that the performance metrics were invalid, and that the review process was being used to harass him. DSOF ¶ 47. Charlene Peiffer, the BLS Regional Commissioner, reviewed Plaintiff's written objections. *Id.* In March 2013, she rejected his request to reconsider the WIGI denial. *Id.*

By January 2013, Plaintiff's work had been cleared for 10% review rather than 100%. *Id.* ¶ 48. That same month, however, he made a critical error in one of his schedules. *Id.* As a result, he was assigned supplemental training, and, per standard certification procedure, placed back on 100% review. *Id.* Plaintiff did not receive his final data collection certification until July 2013—over a year after he received interim certification. *Id.*; *see also* [97-10] at 37; [97-9] at 21–22 (final stage of certification process should be a matter of 2–4 months).

In August 2013, Plaintiff again fell short of BLS' efficiency requirements, so Nguyen placed him on a Performance Improvement Plan (PIP). DSOF ¶ 49; [97-47] at 2. Since October 2012 (the start of the most recent performance review period), Plaintiff had averaged 27.5 HPPS, well above the regional standard of 16 HPPS and

the maximum acceptable rate of 18.4 HPPS. DSOF ¶ 49; [97-47] at 6. The memo accompanying Plaintiff's PIP explained that he could be terminated if his performance in any "result" area failed to meet acceptable standards at any point within a year from the start of the PIP. [97-47] at 3.

In February 2014, Plaintiff successfully completed the PIP, temporarily increasing his efficiency rate to 16.8 HPPS and securing sufficient appointments. DSOF ¶ 50; [97-49] at 8. At this point Nguyen warned him again that, per federal regulations, he could be removed from his position if his performance was rated unacceptable within twelve months of the PIP's initiation. [97-48]. Plaintiff also received his performance evaluation, which had been postponed until he completed the PIP. *See id.* ¶ 51; [97-47] at 3. Despite the recent improvement in his efficiency, Plaintiff received a "minimally satisfactory" performance rating because two of his "result elements" still fell short of acceptable standards. DSOF ¶ 51; [97-49] at 3. Specifically, the quality of Plaintiff's data did not meet BLS standards, and he failed to follow certain BLS procedures. DSOF ¶ 51; [97-49] at 7, 10. Because of this negative review, Plaintiff remained ineligible for a WIGI. DSOF ¶ 52.

Plaintiff contends that Marcotte and Nguyen tanked his ratings and prevented anyone who gave him a successful rating from reviewing his work again. R. DSOF ¶ 51. But Plaintiff cites a mixed history of ratings: Nguyen and Marcotte marked some schedules successful, and some unsuccessful, as did another reviewer listed only by the initials "SAW." *See* [97-9] at 3, 4. Plaintiff offers no evidence to support the claim that Marcotte and Nguyen prevented other supervisors from

reviewing his work. *See* R. DSOF ¶ 51. Plaintiff also denies that he made errors affecting the quality of his schedules, citing only an affidavit he submitted with an Equal Employment Opportunity (EEO) complaint in July 2013. *See id.*; [97-10] at 38–41; R. DSOF ¶ 51; [97-10] at 3.

In March 2014, Nguyen told Plaintiff that his calendar showed no appointments for February or March and he was "failing" two performance metrics. DSOF ¶ 72. By June, Plaintiff's calendar reflected two appointments in March, with none in April or May. *Id.*; [97-63] at 5–8 (Plaintiff's calendar). Nguyen noted that Plaintiff failed to complete even assignments "at the GS-7 level," well below his GS-12 grade. DSOF ¶ 72; [97-63] at 2. Moreover, because Plaintiff submitted only three productive schedules between February 14 and May 31, his HPPS had reached 147.08, exponentially higher than the 18 HPPS maximum acceptable rate. DSOF ¶ 73. This meant that Plaintiff once more failed to meet performance standards for collecting data efficiently, one of his evaluated "result elements." *Id.*

As a result, Nguyen issued Plaintiff a notice of proposed removal on June 9, 2014, citing his failure to collect data efficiently. *Id.*; [97-64]. Plaintiff exercised his right to answer this notice, *see* [97-64] at 5, responding that "retaliation, harassment," and a hostile work environment prevented him from working efficiently, DSOF ¶ 74; [97-65] at 1–18. Plaintiff argued that the February to May assessment period was "arbitrary," and Nguyen should have assessed his productivity from the beginning of the PIP. DSOF ¶ 74. Plaintiff also submitted

letters from his doctors about his diabetes symptoms, along with copies of various EEO complaints and emails with Nguyen.  *Id*.; [97-65] at 20–39.

On August 11, Peiffer notified Plaintiff that, having reviewed the submitted evidence and Plaintiff's objections, she affirmed the decision to remove him.  DSOF ¶ 75.  Her decision upheld Nguyen's basis for removal: that Plaintiff failed to meet BLS' efficiency requirements.   [97-66] at 2, 5.   Peiffer noted that Plaintiff demonstrated his ability to do his work by successfully completing the PIP, but that he failed to maintain his performance.  *See id*. at 3–4; DSOF ¶ 75.  She also determined that Plaintiff's diabetes could not justify his low productivity: the record failed to show that he was denied meal breaks and his plans for cataract surgery that fall did not explain Plaintiff's past poor performance, particularly when he had maintained productivity while on the PIP.  [97-66] at 4.  Peiffer found no evidence that Plaintiff was harassed by his supervisors or mentors.  *Id*. at 3.  Finally, the February to May review period was not "arbitrary": after being placed on the PIP in August 2013, Plaintiff had to maintain an acceptable performance level for one year, as he was warned.  *Id*. at 3–4.  February to May represented the minimum 90 days that constituted a rating period under DOL regulations.  *Id*. at 4.  During those 90 days, Plaintiff's 147.08 HPPS failed to meet "the minimum acceptable level of performance for retention," and justified his removal.  *Id*. at 3, 4.  Plaintiff's termination went into effect August 15.  *Id*.

## G.    Spoliation Claims

While Plaintiff remained at BLS, he filed several amended complaints before the CRC following the August 2012 complaint resulting in his written

accommodation. *See* DSOF ¶¶ 31–32, 53. Plaintiff added claims for harassment and retaliation on November 6, 2012; retaliatory discipline on November 20, 2012; and retaliatory denial of a WIGI on April 22, 2013. *Id.* ¶ 53. In August 2013, Plaintiff appealed the WIGI denial to the Merit Systems Protection Board (MSPB). *Id.* Finally, after the CRC denied his claims in March 2014, Plaintiff filed a new complaint alleging further retaliatory actions. *Id.*

At some point while these complaints were pending, Plaintiff discovered that the "properties" dialog box for four of his OJT evaluations (called "OJT checklists") showed that these evaluations had been "modified" several months after they were created. *Id.* ¶ 54. The information in the "properties" window does not reflect what changes were made to the OJT checklists, which are Word documents maintained on a shared drive. *Id.* ¶¶ 54, 58.

Three of the four apparently modified OJT checklists correspond to interviews marked "successfully completed" on Plaintiff's certification form, and thus, even if modified, they did not negatively affect his performance evaluations. *See id.* ¶ 55; [97-9 at 3] (certification form); [97-54] (corresponding OJT checklists). Nguyen testified that the OJT checklists were not used for Plaintiff's performance evaluations in any case, nor did they factor into the WIGI denials. DSOF ¶ 55.

Plaintiff argues that OJT checklists affected his evaluations and WIGI denial but does not explain how, other than to point to his fiscal year 2012 evaluation. *See* R. DSOF ¶ 55. That evaluation notes errors in Plaintiff's submitted schedules but does not rely upon the OJT checklists. *See* [97-7]. It briefly notes that Plaintiff

*received* OJT but does not otherwise reference any OJT materials. *Id.* at 4. This makes sense since OJT checklists are administrative documents intended to track a newly hired statistician's progress toward final certification, and do not correspond to the more generic "result elements" assessed in BLS' performance evaluations. *Compare* [97-8] at 14–17 (Industrial Price Certification Procedures), *with* [97-7] (BLS performance evaluation form).

Plaintiff claims that the "modifications" demonstrate that Nguyen, Marcotte, and Isaac added "false errors" to his OJT checklists in July 2012. DSOF ¶ 56. Plaintiff asserts that the errors recorded in these checklists did not appear before he filed an EEO complaint. *Id.* In their depositions, Nguyen, Marcotte, and Isaac testified that they never added "false" errors. *Id.* ¶ 57. They also testified that OJT forms may be updated on a rolling basis, and that it is not unusual for mentors to make changes up until a trainee submits a schedule. *Id.* ¶ 58.

Around February 2014, Plaintiff lost access to folders on BLS' shared drive containing his OJT checklists and OJT documents for other employees. *Id.* ¶ 59. Plaintiff raised the issue with DOL's attorney in the MSPB proceedings, who conferred with BLS. *Id.* The next day, Nguyen sent Plaintiff a link to access his OJT forms. *Id.* DOL's attorney also explained that Plaintiff should never have had access to OJT documents relating to other employees. *Id.*

Following this incident, Plaintiff filed a motion for sanctions before the MSPB, arguing that Nguyen intentionally deleted his OJT folder and denied him access to other employees' folders. *Id.* ¶ 60. BLS agreed to preserve the hard drive

from Nguyen's laptop and to attempt to locate and preserve copies of the shared drive as it existed in October 2013 and January 2014. *Id.* The administrative judge presiding over the MSPB proceedings did not issue a final ruling on Plaintiff's motion. *Id.* In March 2014, Plaintiff filed an administrative claim with DOL for spoliation of evidence by Nguyen, Isaac, and others. *Id.* ¶ 62.

During the foregoing proceedings, Plaintiff secured Nguyen's approval to use some official work time to pursue his CRC and MSPB claims. *Id.* ¶ 61. Nguyen would consult with attorneys in DOL's Solicitor's Office about Plaintiff's requests to use his time for this purpose, and, based upon their input, she sometimes granted only part of the time that Plaintiff asked to use for this purpose. *Id.*

## H. Comparators

During Plaintiff's tenure, Nguyen supervised 18 employees and gave 4 field economists[5] "minimally satisfactory" ratings, none of whom had a disability or engaged in protected activity. *Id.* ¶ 76. Nguyen placed 7 other field economists on 100% review when they failed to complete the industrial price certification program; again, none had disabilities or engaged in protected activity. *Id.*

Plaintiff identifies Kent Rupp and Chris Widen as similarly-situated employees. *Id.* ¶ 77. Rupp was a junior economist who started working at BLS at the same time as Plaintiff, but entered at the GS-8 rather than the GS-12 pay grade. *Id.* ¶¶ 1, 77. Rupp received a "minimally satisfactory" performance evaluation for 2012 due to his "needs to improve" rating on four result elements. *Id.*

---

[5] Plaintiff's position could be held by either an economist or statistician; the position description labels it "Field Economist or Statistician." *See* [97-2] at 3. Thus, BLS "field economists" and "field statisticians" like Plaintiff occupy the same role.

¶ 77; [97-69] at 2, 4. The evaluation noted that Rupp had only one appointment in May and none in July, and that he did not submit data in a timely manner. [97-69] at 6; PSAF ¶ 81. Rupp, like Plaintiff, was evaluated using the HPPS metric. DSOF ¶ 77. Rupp remained on 100% review for his entire tenure at BLS, which ended when he resigned in November 2012. *Id.* Nguyen did not know of any instance when Rupp failed to follow instructions or showed a lack of candor. *Id.* At some point between Rupp's resignation and February 2014, Nguyen deleted her emails with Rupp because she did not think she needed them anymore. *Id.*

Widen started at BLS in January 2010 as a GS-11 economist. *Id.* ¶ 78. Widen received "highly effective" performance reviews for 2012 and 2013. *Id.* Widen secured certification for one price program in August 2010, and initiated the process of being certified in a second price program. *Id.* Widen resigned from BLS in June 2014. *Id.* Nguyen did not know of any occasion on which Widen failed to follow instructions or showed a lack of candor. *Id.*

## I. This Case

Plaintiff sued the Secretary of Labor and a number of DOL employees in April 2014. [1]. He amended his complaint in March 2015. [33]. Plaintiff brings claims for failure to accommodate and "retaliation and harassment" under the Rehabilitation Act, and a spoliation claim under the FTCA.[6] *Id.* at 11, 13, 16.

Plaintiff's failure to accommodate claim alleges that BLS forced him to miss regular meals, which he needed to control his diabetes. *Id.* ¶¶ 29–30. Specifically,

---

[6] Plaintiff's spoliation claim was initially labeled a supplemental state-law claim. [33] at 16. This Court's predecessor struck that caption as "potentially misleading," [45], and the parties have litigated this claim under the FTCA, *see* DSOF ¶ 80; [96] at 6; [105] at 5, 10.

Plaintiff points to the June 2012 trip, which he alleges exacerbated his diabetes. *Id.* ¶ 30. Plaintiff's claim arises from Nguyen's denial of the accommodation that Plaintiff requested after the June 2012 trip, and the CRC's subsequent denial of his failure to accommodate claim in March 2014. *See id.* ¶ 33; [1] at 69.

Plaintiff's claim for retaliation and harassment alleges, among other things, that as a result of his protected activity he was subjected to "heightened scrutiny" and improperly suspended; that his supervisors fabricated errors in his OJT review forms; and that his termination was unlawful. [33] ¶¶ 35–41. Plaintiff claims that these actions constituted retaliation for protected activity, specifically, his complaints of discrimination after the June 2012 trip. *See id.* ¶¶ 22–24, 35, 36, 38.

Plaintiff's FTCA spoliation claim arises from Nguyen, Marcotte, and Isaac's alleged alterations of his OJT evaluations and Nguyen's deletion of her emails with Rupp. *See id.* at 16; DSOF ¶ 80; [97-52] at 18–20.

Before this Court are Defendant's motion for summary judgment on all counts [95], and Plaintiff's motion for partial summary judgment only on his failure to accommodate claim, [104].

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary

judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party must do more than create "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. The moving party is entitled to summary judgment where the non-moving party fails to establish an "essential element" of the case for which that party has the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

## III. Analysis

### A. Failure to Accommodate

To establish a failure to accommodate claim under the Rehabilitation Act, Plaintiff must prove that: (1) "he is a qualified individual with a disability"; (2) his employer knew of his disability; and (3) "the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).[7]

---

[7] Here and elsewhere, this Court cites cases applying the Americans with Disabilities Act (ADA) as well as the Rehabilitation Act, since these statutes and their implementing regulations are

In general, "an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation." *Guzman v. Brown Cnty.*, --- F.3d. ---, 2018 WL 1177592, at *6 (7th Cir. 2018) (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000)). The request need not be formal or explicit. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005). Ordinarily, that request triggers an "interactive process" between employer and employee "to determine the extent of the disability and what accommodations are appropriate and available." *Id.* (internal quotation marks omitted); *see also Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (plaintiff "typically must *request* an accommodation for his disability in order to claim that he was improperly *denied*" an accommodation). As the Seventh Circuit notes, however, courts must apply this general rule with flexibility when addressing the initiation of the interactive process:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Accordingly, under certain circumstances, an employer aware of an employee's

---

sufficiently similar that "courts construe and apply them" consistently. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004).

difficulties can remain obliged to initiate the interactive process, even absent a specific request for an accommodation. *See Jovanovic*, 201 F.3d at 899; *Bultemeyer v. Ft. Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (where an employee suffers from a mental illness, employer who is "aware of the difficulties" must help the employee "determine what specific accommodations" are necessary).

Here, Defendant seeks summary judgment on the grounds that Plaintiff cannot prove that it knew of his disability before he expressly requested an accommodation in June 2012, and that after the request, Defendant granted him a reasonable accommodation. [96] at 26–27.

### 1. Period Preceding June 2012 Accommodation Request

The parties agree that Plaintiff informed BLS of his diabetes when he started work in February 2012, but that he did not request an accommodation when he was hired. DSOF ¶ 2; [107] at 7. At summary judgment, however, this Court accepts Plaintiff's declaration that he told Nguyen, shortly after starting work, that travel associated with his observational interviews made it difficult for him to keep a consistent meal schedule. *See* [107] at 7.

Construing this fact as an informal request for accommodation, Plaintiff's own account shows that Nguyen responded by rescheduling some of his interviews to take place locally rather than in Wisconsin and by securing him a pass to the government parking garage so that he could return his government car on a flexible schedule. *See id*. at 107–09. Since Plaintiff complained that traveling for work made it difficult for him to take meal breaks, Nguyen's response constituted a

reasonable accommodation, because reducing Plaintiff's travel time and enhancing his ability to stop for meals responded to his stated medical needs. *See Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 681–82 (7th Cir. 2010) (offering to station incontinent employee near bathroom and permit breaks constituted a reasonable accommodation designed to address employee's needs); *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) (reasonable accommodation depends upon "what the employer knows about the employee's precise limitations.").

The record suggests that Nguyen did not secure the parking pass portion of the accommodation until around June 2012. *See* [97-6] at 7; DSOF ¶ 20. But this delay does not prove that Defendant failed to reasonably accommodate Plaintiff; Nguyen took interim steps by rescheduling his observational interviews, and, according to Plaintiff, told him she "was working on it." [107] at 9; *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177–78 (7th Cir. 2013) (four-month delay in securing accessible parking pass was not failure to accommodate), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (finding defendant acted reasonably and in good faith despite 20-month delay in securing an accommodation); *Morris v. Ford Motor Co.*, No. 15-cv-302-wmc, 2016 WL 4991772, at *6–7 (W.D. Wis. Sept. 16, 2016) (collecting cases supporting general rule that even significant delays in securing an accommodation are generally reasonable absent a showing of bad faith).

The record fails to show that Plaintiff requested any further accommodation at this time, and his employer is not liable for failing to meet additional, unspoken needs absent some intervening circumstance sufficient to trigger the interactive process unilaterally (such as an employee's mental illness or an employer's actual knowledge of an employee's ongoing difficulties working with a disability). *See Preddie*, 799 F.3d at 813 (affirming summary judgment for defendant where defendant knew of employee's diabetes but employee never requested an accommodation other than unexplained, intermittent requests for days off); *see also Cloe*, 712 F.3d at 1179; *Beck*, 75 F.3d at 1136–37. Here, no intervening circumstance exists and Plaintiff fails to point to any obstacle impeding his ability to communicate his perceived needs to Defendant. *See* [105] at 6–7. Indeed, Plaintiff's significant advocacy on his own behalf throughout his employment with BLS belies any claim that he was incapable of asking for necessary accommodations, which could have obligated Defendant to initiate the interactive process. *Cf. Bultemeyer*, 100 F.3d at 1285.

In sum, the record does not show that Defendant denied Plaintiff a reasonable accommodation in the period before June 2012.

### 2.    June 2012 Trip

Plaintiff's own account of the June 2012 trip to Minneapolis confirms that he did not request an accommodation on or for this trip. With respect to the allegedly missed meals on June 5 and June 6, nothing in the record shows that Plaintiff ever mentioned his diabetes to Marcotte, his mentor for the trip, "let alone what should have or could have been done" for him. *Hunt-Golliday v. Metro. Water Reclamation*

*Dist. of Greater Chi.*, 104 F.3d 1004, 1013 (7th Cir. 1997); *see also* DSOF ¶ 22; [107] at 10. Plaintiff declares that before the trip he told Nguyen not to schedule additional appointments for the trip, but he fails to show that she ignored this request. [107] at 11. At most, the record shows that when Marcotte scheduled a second appointment on June 7, Plaintiff left voicemails for Nguyen stating "I couldn't do this," which Plaintiff assumes Nguyen would understand as a reference to his diabetes. DSOF ¶¶ 23–25. Absent evidence that Plaintiff expressed a desire for an accommodation, or that some extraordinary circumstance obviated the need for such a request, Defendant did not fail to accommodate him. *See Preddie*, 799 F.3d at 813; *Cloe*, 712 F.3d at 1179; *Sears*, 417 F.3d at 803.

Once again, neither Plaintiff nor the record supplies any reason during this period to displace the general rule that the employee must seek an accommodation before the employer can be liable for denying one. *See Guzman*, 2018 WL 1177592, at *6; *Jovanovic*, 201 F.3d at 899. Nothing in the record suggests that Plaintiff suffers a condition that inhibited his ability to request a further accommodation. *Cloe*, 712 F.3d at 1179. Indeed, Plaintiff submitted his formal request for accommodation shortly after he returned from Minneapolis. *See* [97-24] at 3. Nor does the record show that Plaintiff's conduct so "obviously" manifested a need for accommodation that Defendant should have affirmatively offered broader accommodations than it had up to that point. *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995). In short, Plaintiff fails to show that Defendant *denied* him a reasonable accommodation relating to the Minneapolis trip because there is

no evidence that Defendant knew or should have known that further accommodations—or even discussions about further accommodations—were needed. *See Preddie*, 799 F.3d at 813; *cf. Bultemeyer*, 100 F.3d at 1285–86; *Hedberg*, 47 F.3d at 934.

Moreover, reasonable accommodation "is a process, not a one-off event," and thus, the single, short-notice scheduling disagreement in this record cannot constitute a failure to accommodate. *See Cloe*, 712 F.3d at 1178. As noted above, the accommodation process must be "interactive," and Plaintiff's sudden, unexplained refusal to accept an appointment that formed a key part of his job indicates that the responsibility for any "breakdown" in the process lies with him. *See Beck*, 75 F.3d at 1135. Further, Plaintiff possessed a union-bargained right to lunch and two 15-minute breaks per day, [97-12] at 3; [107] at 47, but the record contains no indication that Plaintiff *ever asserted those rights*, despite the fact that Nguyen told him to do so, *see, e.g.* [97-25 at 2] (Nguyen emails); [107] at 9–10 (Plaintiff describes voluntarily skipping lunch without reporting it). This indicates that Plaintiff failed to engage in the accommodation process in good faith, which mitigates Defendant's liability. *See Beck*, 75 F.3d at 1135.

Finally, the record confirms that Plaintiff virtually controlled his own schedule. *See* DSOF ¶¶ 17, 29, 30 (Nguyen sought to help Plaintiff make his own appointments and reminded him that he controlled his schedule); [97-2] at 6, 8; [97-12] at 3 (Nguyen reminded Plaintiff to take lunch and to reschedule appointments if necessary); [97-18] at 3, 5–6; [97-28] at 3 (November 2012 accommodation

agreement, signed by Plaintiff, acknowledging that he has the "ability and responsibility" to make his own appointments and take meals). When traveling, Plaintiff enjoyed the use of a government car to make his own way to and from appointments, or else took flights through normal commercial airports. *See* [97-6] at 7; DSOF ¶ 20; [97-61] at 7. Thus, while on the June 2012 trip, Plaintiff's travel remained largely within his own hands; Plaintiff offers no explanation why it was Defendant's responsibility to ensure that he planned ahead for meals and snacks.

In general, employers are not responsible for "activities that fall outside the scope of employment, such as commuting to and from a job location," or that are affected by employees' independent decisions, such as where they live. *See Kimble v. Potter*, No. 06-cv-2589, 2009 WL 2045379, at *7 (N.D. Ill. July 13, 2009) (collecting cases) (internal quotation marks omitted); *see also Schneider v. Cont'l Cas. Co.*, No. 95-c-1820, 1996 WL 944721, at *9 (Dec. 16, 1996) ("An employer is required to provide reasonable accommodations that eliminate barriers in the work environment, not ones that eliminate barriers outside of the work environment."). Such independent decisions surely include when and how employees eat meals while unsupervised out of the office and otherwise in control of their own schedules.

Indeed, other courts have found that diabetic employees share responsibility for taking their meals unless their employer erects an affirmative barrier to doing so. *Compare, e.g.*, *Martin v. Yokohama Tire Corp.*, Nos. 7:11-cv-00244, 7:11-cv-00467, 2013 WL 6002344, at *14 (W.D. Va. Nov. 12, 2013) (employer reasonably accommodated diabetic employee with respect to meal breaks where employee could

34

eat on the job, take breaks, and access food "as a matter of course in his job"), *with Lillian v. Nat'l R.R. Passenger Corp.*, 259 F. Supp. 3d 837, 841, 845 (N.D. Ill. 2017) (fact issue precluded summary judgment on failure to accommodate claim where employer initially denied diabetic employee's requested breaks and opened investigation into employee for taking lunch). Plaintiff shows no such barrier here. His bare statement that during the June trip he was "scheduled to work and travel" through meals, [107] at 19–20, does not explain what actions Defendant took that prevented Plaintiff from eating any meals during the time he traveled unsupervised.

Given Plaintiff's control over his own schedule, his established right to meal and lunch breaks, his failure to utilize or invoke those rights, his failure to communicate in good-faith to Nguyen or Marcotte that his diabetes prevented him from taking on the second appointment on June 7, the absence of any extraordinary circumstances requiring Defendant to affirmatively offer further accommodation, and Plaintiff's failure to explain why he could not have planned ahead with respect to his own meals (for example, by packing a sandwich), no reasonable jury could find that Defendant denied Plaintiff a reasonable accommodation with respect to the June 2012 trip to Minnesota.

### 3. Period Following June Request

The law requires a collaborative effort to secure a reasonable accommodation. *See Cloe*, 712 F.3d at 1178. Once an employee requests an accommodation, the employer must "engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Sears*, 417 F.3d at 805

(internal quotation marks omitted). But failing to engage in this process is only actionable if such failure "prevents identification of an appropriate accommodation" for the employee. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). Finally, "an employer is not required to provide the exact accommodation requested." *Cloe*, 712 F.3d at 1178 (citing *Sears*, 417 F.3d at 802).

Here, the record contains no evidence that Defendant failed to engage in the interactive process or failed to provide a reasonable accommodation in response to Plaintiff's June 2012 request. Plaintiff submitted his request for reasonable accommodation on June 18. [97-24] at 3. He requested a modification to eat regularly scheduled meals three times a day and advance notice of any travel. *Id*. Nguyen denied this request for the simple reason that everything he sought was already within his power, in light of his union-bargained rights to lunch and rest breaks, and the fact that Plaintiff had the authority and responsibility to schedule his own appointments that required travel. [97-25] at 2. As she put it:

> Taking breaks and eating lunch as well as scheduling appointments are already your rights and responsibilities. Therefore there is no need to make any modifications to the essential functions of your position. Please contact me if you have any questions or need clarification.

*Id*. Instead of responding to Nguyen's denial directly, Plaintiff filed his union grievance the following week. *See* [97-26]. This produced an agreement in August—endorsed by Plaintiff's union representative—that Nguyen would help Plaintiff plan his appointments around meal times. *See* [97-27] at 4. But within days of that agreement, Plaintiff filed a CRC complaint about Nguyen's denial of his accommodation request. DSOF ¶ 31. This produced a formal accommodation

agreement, which Plaintiff signed and which included specific accommodations relating to the "rare instances" that someone made Plaintiff's appointments for him; this agreement also confirmed that Plaintiff had the "ability and responsibility" to set his own schedule and take his own breaks. [97-28]. Plaintiff does not allege that he missed any meals after his accommodation request. *See* [107] 5–29. Further, when Plaintiff was subsequently placed on the PIP, he was able to meet BLS' expectations with this agreement in place. *See* DSOF ¶ 50; [97-49] at 8.

As these facts demonstrate, this is not a case where an employer "took no action other than to reject the employee's request." *Sears*, 417 F.3d at 807. Though Nguyen rejected Plaintiff's first express request for accommodation, she did so because she found it unnecessary. Nor was Nguyen required to accept Plaintiff's request as proposed, *Cloe*, 712 F.3d at 1178; she merely had to engage in a "flexible give-and-take" with Plaintiff to identify an appropriate accommodation, *Sears*, 417 F.3d at 805. She did so by explaining her reasons for rejecting the initial request and encouraging Plaintiff to contact her if he had questions. That Plaintiff chose to pursue his request through a union grievance or CRC process rather than by following up with Nguyen does not indicate that Defendant failed to engage in the requisite process; indeed, the fact that the parties ultimately identified and implemented a reasonable accommodation precludes any claim here that Defendant failed to engage in the interactive process. *See Basden*, 714 F.3d at 1039.

And the accommodation Defendant granted *was* reasonable; this fact, in itself, dooms Plaintiff's claim. True, Plaintiff did not sign the accommodation

agreement until December 2012, but again, absent evidence of bad faith—which Plaintiff has not offered—such delays are not actionable. *See Morris*, 2016 WL 4991772, at *6–7. The accommodation here was reasonable: it included notice of travel and special protections for Plaintiff's lunch break. [97-28] at 2. Even though it did not explicitly cite Plaintiff's requested breaks for breakfast and dinner, it clearly affirmed his right to take breaks in the morning and afternoon. *Id*. at 3.

In combination, the circumstances outlined in the agreement reasonably respond to Plaintiff's stated medical needs. *See Gratzl*, 601 F.3d at 681–82 (accommodation that addressed the plaintiff's medical needs but did not grant every request was reasonable); *Martin*, 2013 WL 6002344, at *14 (employer reasonably accommodated diabetic employee as to meal breaks where employee could eat on the job, take breaks, and access food "as a matter of course in his job"); *Hughes v. S. N.H. Servs., Inc.*, No. 11-cv-516-SM, 2012 WL 5904949, at *5–6 (D.N.H. Nov. 26, 2012) (employer granted reasonable accommodation by permitting teacher to eat her own food as needed, despite refusing to let her absent herself from the children's lunch hour); *Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 487 (S.D.N.Y. 2008) (accommodation was reasonable where employer granted diabetic employee the right to eat dinner at her requested time despite refusing to grant a "full break"). Again, Plaintiff offers no evidence of any barrier put up by Defendant that prevented him from eating, either in the office or while traveling independently (nor can he, where the record is replete with Nguyen's reminders that he take his union-

bargained breaks). *See* [97-11] at 4–5; [97-25] at 2; [97-34] at 2; [107] at 7; *cf.*
*Lillian*, 259 F. Supp. 3d at 841, 845.

Finally, Plaintiff's conduct after receiving the accommodation supports this
Court's finding of reasonableness: Plaintiff did not subsequently miss any meals; he
improved his performance (at least while completing the PIP); and he did not
request any further accommodation. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539,
548 (7th Cir. 2008) (finding no failure to accommodate where employee was able to
perform and did not request further accommodation); *Beck*, 75 F.3d at 1136–37
(employer did not fail to accommodate plaintiff where employer engaged with all of
plaintiff's requests and plaintiff failed to provide information necessary for any
further accommodation).

In sum, no reasonable jury could find that Defendant failed to reasonably
accommodate Plaintiff. *See Anderson*, 477 U.S. at 248. Accordingly, Defendant is
entitled to summary judgment on Plaintiff's failure to accommodate claim.[8]

## B.    Retaliation

Before the Seventh Circuit's decision in *Ortiz v. Werner Enterprises*, courts
assessed retaliation claims on two tracks: the direct and indirect methods of proof.

---

[8] Significantly, Plaintiff's brief limits his failure to accommodate claim to the alleged denial of his
June 2012 accommodation request. *See* [105] at 6. As such, Plaintiff fails to address Defendant's
arguments as to any other events of his employment, and thus Plaintiff abandons claims arising
from Defendant's other actions. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003)
(non-moving party abandons claim by failing to respond to motion for summary judgment in its
opposing brief). Likewise, Plaintiff's arguments as to the June 2012 denial fail to cite case law or, for
the most part, any record evidence. *See* [105] at 6–7. Such "undeveloped arguments, and arguments
that are unsupported by pertinent authority, are waived." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th
Cir. 2016). This rule applies even to *pro se* plaintiffs. *See Sabbia v. Comm'r of Soc. Sec. Admin.*, 669
F. Supp. 2d 914, 920 (N.D. Ill. 2009) (citing *Mathis v. N.Y. Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir.
2009)). Plaintiff's abandonment and waiver provide alternate grounds for this Court's rejection of
his failure-to-accommodate claim.

*See, e.g.*, *Anderson v. Donahoe*, 699 F.3d 989, 994–95 (7th Cir. 2012). The direct method required plaintiffs to show: (1) protected activity; (2) a materially adverse action by their employer; and (3) "a causal connection between the two." *Id*. at 995. The indirect method required plaintiffs to "establish a prima facie case of retaliation by demonstrating that after engaging in protected activity such as filing a charge," they were "subjected to an adverse employment action" despite performing satisfactorily, and "no similarly situated employee who did not file a charge was subjected to the adverse employment action." *Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005). The latter method followed the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): if the plaintiff established the prima facie case, the employer had to offer legitimate grounds for the adverse action; if it did so, the plaintiff had to prove that the proffered reason was pretextual. *See Mannie*, 394 F.3d at 984.

Defendant performs both methods of analysis, on the understanding that *Ortiz* did away with distinguishing direct from indirect evidence and left intact the direct and indirect methods of proof. *See* [96] at 28 n.7. Not quite—*Ortiz* put a stop to attempts "to shoehorn all evidence into two 'methods'" as if they were distinct "legal standards." *See* 834 F.3d at 763–65. Instead, *Ortiz* directed Courts to ask one question: "whether the evidence would permit a reasonable factfinder to conclude that" some "proscribed factor" caused the adverse employment action. *Id*. at 765. *Ortiz* did not alter *McDonnell Douglas*, *id*. at 766, which remains a viable method of "organizing, presenting, and assessing circumstantial evidence" of

discrimination, *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). But *McDonnell Douglas* is not the only means of assessing evidence, and courts in this circuit must now consider the evidence holistically when answering the central question of whether discrimination occurred. *See id.*

Accordingly, courts addressing discrimination claims now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" to determine "whether it permits a reasonable factfinder" to conclude that the challenged employment action was attributable to a proscribed factor. *Id.*; *see also Harris v. Chi. Transit Auth.*, No. 14-c-9106, 2017 WL 4224616, at *4–5 (N.D. Ill. Sept. 22, 2017); *Deacon v. Peninsula Chi., LLC*, No. 16-cv-1464, 2017 WL 3531518, at *9–10 (N.D. Ill. Aug. 17, 2017).

### 1. *McDonnell Douglas*

Under the *McDonnell Douglas* framework, Plaintiff must show that: "(1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). If Plaintiff establishes a prima facie case, Defendant must "articulate some legitimate, nonretaliatory reason for its action." *Id.* If Defendant does so, the burden reverts to Plaintiff to show that the stated reason is pretextual. *Id.* Defendant argues that Plaintiff cannot establish a prima facie case, and even if he could, he cannot show that Defendant's reasons were pretextual. [96] at 30, 32. This Court agrees.

The parties agree that Plaintiff engaged in protected activity when he requested an accommodation in June 2012 and filed various grievances thereafter. *See* [96] at 29; *see also Anderson v. Donahoe*, 699 F.3d at 994 (EEO complaints are protected activity); *Silk v. City of Chicago*, 194 F.3d 788, 801 (7th Cir. 1999) (request for accommodation is "protected expression"). As to the second prong, Defendant points out that, of all the allegedly retaliatory actions that Plaintiff identifies, only three constitute adverse employment actions: the suspension in 2012; the WIGI denials in 2013 and 2014; and Plaintiff's termination. [96] at 28. Plaintiff does not contest this point in his response, *see* [105] at 8–10, and so waives the argument, *Palmer*, 327 F.3d at 597–98.

Even if he did contest it, however, this Court agrees with Defendant that improvement plans, close supervision, reprimands, and negative reviews are not adverse actions, unless they "materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001); *see also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 466 (7th Cir. 2014); *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996); *Kruger v. Principi*, 420 F. Supp. 2d 896, 909, 910–14 (N.D. Ill. 2006) (assessing a range of allegedly adverse actions and noting that Title VII precedent applies to Rehabilitation Act claims).

To the extent that Plaintiff contends that various actions rose to the level of "harassment"—which may in some cases be so severe as to materially alter working

conditions—the conduct he alleges falls far short of constituting an adverse action.[9] *Compare* [107] at 24, 28 (Nguyen and Marcotte delayed review of Plaintiff's schedules and Nguyen altered his credit hours) *with Stutler*, 263 F.3d at 704 (neither repeatedly threatening to fire plaintiff nor listening in on telephone calls constitute adverse actions) (internal citations omitted). Thus, this Court addresses only Plaintiff's suspension, WIGI denials, and termination.

With respect to Plaintiff's suspension, Plaintiff fails to show that he met Defendant's legitimate employment expectations or that Defendant treated any similarly-situated employee more favorably. Defendant suspended Plaintiff for lack of candor and for failing to follow instructions with respect to his timesheets and the number of appointments he secured for July 2012. *See* DSOF ¶ 40; [97-31]. Plaintiff contests the lack of candor as a matter of miscommunication, but offers no evidence showing that he followed instructions either as to the timesheets or his July appointments. *See* R. DSOF ¶¶ 39–42.

Nor does Plaintiff identify a similarly-situated employee who was treated more favorably. He argues that Rupp, another field economist hired at the same time as Plaintiff, also failed to secure 10 appointments in July but was not disciplined. *See* [107] at 26–27; [105] at 10. This argument effectively concedes that Plaintiff was not meeting expectations, and reframes his claim as one that Defendant applied its disciplinary measures in a discriminatory fashion. In such

---

[9] At oral argument, Plaintiff appeared to contend that he raises a harassment claim distinct from his retaliation claim, despite the fact that his amended complaint shows otherwise. *See* [33] at 13. To the extent the claims are separate, however, any independent harassment claim also fails because, as discussed, the conduct Plaintiff describes is not "sufficiently severe and pervasive so as to alter the conditions of employment." *Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008).

cases—where a plaintiff claims to have been "more harshly" disciplined than a coworker—the plaintiff must show that the alleged comparator is "similarly situated with respect to performance, qualifications, and conduct." *Dossiea v. Bd. of Educ. of City of Chi.*, No. 07-c-1124, 2008 WL 4133418, at *5 (N.D. Ill. Aug. 22, 2008); *see also Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). An employee without a similar disciplinary history and performance record is not similarly situated. *Simpson*, 827 F.3d at 662. This inquiry into comparators overlaps with the question of pretext, *id.*, and it may be decided at summary judgment if no reasonable jury could find that the plaintiff met his "burden on the issue," *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012).

Plaintiff does not meet his burden here. Other than his assertion that Rupp failed to secure 10 appointments in July, Plaintiff offers no evidence that Rupp engaged in similar infractions, or that his performance history before July was similar to Plaintiff's work history. *See generally* [107]; *see also* [105] at 10. The record does not show that Rupp ever failed to follow instructions or showed a lack of candor. *See* DSOF ¶ 77. Absent evidence of coworkers who engaged in "comparable misconduct," Plaintiff fails to satisfy his burden. *See Boss*, 816 F.3d at 919.

As to pretext, Plaintiff offers only Nguyen's allegedly intentional deletion of Rupp's emails—based upon pure speculation of a cover-up—and unsupported allegations that Defendant improperly pressured him into dropping the present suit. *See* [105] at 8. Plaintiff's speculation about Nguyen's intent is not evidence that can withstand summary judgment. *See Boss*, 816 F.3d at 919. Likewise,

Plaintiff's allegations of improper pressure lack any supporting evidence: the exhibit he cites contains only his account of an MSPB mediation process in May 2014 and his apparent attempt to reengage in a settlement discussion. *See* [107-4] at 104. In any event, Plaintiff does not explain how these events show that Defendant's stated reasons for its disciplinary actions were pretextual. *See* [105] at 8. Finally, Plaintiff's generalized allegations of harassment are mere "conclusory assertions," which "do not constitute evidence and so cannot overcome summary judgment." *Boss*, 816 F.3d at 919.

Similar problems plague Plaintiff's arguments regarding the WIGI denials and his termination. Again, Plaintiff offers no evidence of a similarly situated employee who was treated more favorably, which is fatal to his claim. *Id.* Plaintiff offers Rupp and Widen, another field economist hired two years before Rupp and Plaintiff, as purported comparators. *See* DSOF ¶ 77. But Widen received "highly effective" performance reviews for 2012 and 2013, and successfully secured certification for a BLS price program within 10 months of his hiring. *Id.* Nor is there any evidence that Widen ever failed to follow instructions, showed a lack of candor, or was placed on a PIP. *Id.* Thus, Widen was not "directly comparable" to Plaintiff "in all material respects" because he did not engage in "similar conduct." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). He is not a valid comparator. *See id.*; *Simpson*, 827 F.3d at 662.

Rupp, on the other hand, might be a viable comparator in some respects, but Plaintiff provides no evidence that Defendant treated Rupp more favorably. With

the exception of his failure to secure appointments in July 2012, which this Court already addressed, Rupp's poor performance *did* incur similar treatment by Defendant, at least while he remained on the job. *See* DSOF ¶ 77. Rupp received a "minimally satisfactory" rating on his 2012 performance evaluation, like Plaintiff, because, like Plaintiff, he had few appointments and did not timely submit his data. *Id*. Rupp's evaluations used the same metrics as Plaintiff's, and Rupp, like Plaintiff, remained on 100% review throughout his tenure at BLS. *Id*. It is useless to speculate as to whether Rupp—who resigned in November 2012—may have been denied a WIGI based upon this performance record, and such speculation is not evidence. *See id.*; *Boss*, 816 F.3d at 919. The record shows that, while employed at BLS, Rupp did not receive favorable treatment. Thus, Plaintiff has not established a prima facie case of retaliation.

Finally, even if this Court considered every purportedly retaliatory action Plaintiff alleges, and even if Rupp and Widen were valid comparators, Plaintiff fails to prove that Defendant's proffered reasons for its actions are pretextual. Defendant produced substantial and compelling evidence that Plaintiff failed to meet its performance requirements almost from the start of his employment, despite repeated warnings, reminders, and escalating disciplinary actions. *See, e.g.*, [97-7]; [97-8]; [97-9]; [97-30]; [97-31]; [97-40]; [97-42]; [97-45]; [97-46]; [97-47]; [97-48]; [97-49]; [97-54]; [97-64]; *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002) (plaintiff's 18-month history of critical performance evaluations and formal warnings established her failure to meet her employer's expectations).

In light of that evidence, it became Plaintiff's burden to show that Defendant's rationale for its disciplinary actions was pretextual. *Boss*, 816 F.3d at 918. To prove pretext, Plaintiff must show that Defendant "lied about its reasons" for taking the adverse actions—not that the employer "was wrong" for taking those actions based upon the reasons it gave. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). In other words, pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). Plaintiff does not come close to meeting this burden.

This Court already discussed Plaintiff's allegations concerning Nguyen's alleged "destruction" of Rupp's emails and the purportedly improper pressure to drop this suit. Again, such speculation and conclusory assertions are not evidence, and cannot withstand summary judgment. *Boss*, 816 F.3d at 919. Moreover, these generalized statements fall short of demonstrating that Defendant's explanations, including the reasons for Plaintiff's suspension, WIGI denials, and termination, "were actually lies designed to camouflage that" Defendant "really acted" because of Plaintiff's protected activity. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 507–08 (7th Cir. 2004). Plaintiff fails to directly address Defendant's stated rationale—namely, that Plaintiff's performance was inadequate, and, in the case of the suspension, worthy of censure—nor does he present "specific evidence" supporting the inference that Defendant "lied about its reasons" for disciplining him. *Hague*, 436 F.3d at 824.

Beyond these generalized allegations, the bulk of Plaintiff's arguments consist of justifications for his performance, accusations that Defendant erred in its assessments of his performance and his entitlement to a WIGI, and assertions that Defendant should have evaluated him differently than it did. *See* [105] at 8–10; [107] at 24, 26; *see generally* R. DSOF. Again, such disputes with Defendant's evaluations do not demonstrate that Defendant *lied* about its rationale for firing him. *Hague*, 436 F.3d at 824. The Seventh Circuit has repeatedly reminded plaintiffs that the courts are not "a super-personnel department" reviewing whether an employer's decisions are "accurate, wise or well considered." *Id.* (internal quotation marks and citations omitted). Even an unfair decision does not show deceit. *Widmar*, 772 F.3d at 466. Here, Plaintiff's arguments constitute precisely the type that the *Widmar* court found insufficient to support an inference of pretext: for every instance in which Defendant contends that Plaintiff failed to perform, Plaintiff claims he is not at fault, and then Defendant responds that Plaintiff was told how he failed to meet expectations and what he needed to do to improve. These quarrels do not show deceit and Plaintiff "has failed to offer any evidence that these expectations were pretext" for retaliation. *Id.* at 466–67.

Plaintiff's final argument for pretext relates to the alleged fabrication of errors on his OJT checklists. *See* [105] at 8; [107] at 27. Plaintiff contends that Nugyen, Marcotte, and Isaac invented errors on his OJT forms to justify their eventual critical performance evaluations and the WIGI denials. *See* [105] at 8; [107] at 27. Plaintiff's sole evidence for this "scheme of tampering" with his records

is his own affidavit. *See* [107] at 27.[10] In the Seventh Circuit, a plaintiff's "uncorroborated testimony" may be "evidence of disputed material facts" that can forestall summary judgment. *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). That rule only applies, however, where such testimony is "based on personal knowledge or firsthand experience." *Id.* That is not the case here.

Plaintiff offers no explanation for how he supposedly knows that Nguyen, Marcotte, and Isaac "fabricated errors" in his OJT checklists. [107] at 27. Even assuming he "knew" this because he "knew" he committed no errors, the OJT checklists were stored on a shared drive and could be "accessed at any time." DSOF ¶ 58. Assuming any errors *were* fabricated, Plaintiff never explains how he knows that Nguyen, Marcotte, or Isaac did it. *See* [107] at 27. Nor does Plaintiff explain how he knows that Defendant actually used the "fabricated" checklists in his performance evaluations and WIGI denials—a crucial omission, considering that none of the documents relating to those actions reference the OJT checklists or training forms, and Nguyen has provided uncontroverted testimony that they were not a basis for these decisions. *See* DSOF ¶ 55; [97-7]; [97-42]; [97-45]. Thus, Plaintiff's testimony does not create a genuine factual dispute since "mere conclusory allegations do not constitute evidence." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *see also Berry*, 618 F.3d at 691.

---

[10] Plaintiff does offer images of a dialog box noting modifications to his OJT checklists, as discussed in the Background section. *See* [97-53]. But the mere fact that these Word documents were "modified" does not show that they were "tampered" with, particularly when Plaintiff fails to rebut Defendant's evidence that OJT forms are updated on a rolling basis. *See* DSOF ¶ 58. This, without more, does not show "deceit." *See Widmar*, 772 F.3d at 466.

In sum, Plaintiff fails to identify a valid comparator whom Defendant treated more favorably, and thus fails to make a prima facie case for retaliation under the *McDonnell Douglas* framework. *See e.g.*, *Widmar*, 772 F.3d at 463. Regardless, he presents no evidence supporting an inference of pretext, which also dooms his retaliation claim. *See Boss*, 816 F.3d at 919.

### 2. *Ortiz* Analysis

Assessing the evidence "cumulatively" under *Ortiz*, *David*, 846 F.3d at 22, this Court comes to the same conclusion. Put simply, Plaintiff does not offer evidence permitting a "reasonable factfinder to conclude" that his protected activities caused the adverse employment actions against him. *Ortiz*, 834 F.3d at 765. At summary judgment, courts consider only admissible evidence. *See, e.g.*, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). As discussed in detail above, Plaintiff's proffered evidence—those parts of his exhibits that constitute evidence— fall short of raising any inference that Defendant singled out Plaintiff for discipline on the basis of his protected activities.

Plaintiff fails to call into question Defendant's documented history of his poor performance, does not identify a comparable employee who was treated more favorably, and offers no incriminating or even "ambiguous" statements suggesting any improper motives on Defendant's part. *See Anderson v. Donahoe*, 699 F.3d at 996. Although Plaintiff suggests that the timing of the adverse actions were suspicious, the record does not support this inference. Close "temporal proximity" can suggest retaliation, but only where additional evidence "supports the inference of a causal link." *Id*. There is no such evidence here. Instead, Plaintiff's

suspension followed on the heels of his failure to follow instructions and Nguyen's concern that he had misrepresented his appointments, *see* DSOF ¶¶ 39, 40, and his WIGI denials followed his performance evaluations, *id*. ¶ 47, 51–52. Finally, his termination occurred at the close of the first 90-day assessment period following his completion of the PIP, in accord with DOL policy. *See* [97-66] at 3–4. Although technically each of these events happened after Plaintiff requested an accommodation and filed his grievances, Plaintiff fails to lay out the timeline connecting these events or to offer "evidence that supports the inference of a causal link." *Anderson v. Donahoe*, 699 F.3d at 996.

This Court notes a final flaw in Plaintiff's claim. As should be clear from the foregoing discussions, Plaintiff's accusations of retaliation and ill-treatment focus on Nguyen, Marcotte, and Isaac. But the adverse employment actions at issue here were not taken or upheld solely by these three individuals. Droste, BLS' Assistant Regional Commissioner, issued the final decision affirming Plaintiff's suspension. DSOF ¶ 44. Peiffer, BLS' Regional Commissioner, upheld both the 2013 WIGI denial and Plaintiff's removal in 2014. *Id*. ¶¶ 47, 75. Finally, DOL's CRC denied a number of Plaintiff's discrimination and retaliation claims in March 2014. *Id*. ¶ 53. Showing that discrimination motivated an employer's actions becomes "difficult" where the action, as here, involves multiple decision-makers. *See Buie*, 366 F.3d at 508 (internal quotation marks omitted). With so many DOL employees reviewing, concurring, and participating in the actions he complains of, Plaintiff simply fails to show that they all possessed an illicit intent to retaliate against him. Indeed, his

arguments only glancingly address Droste and Peiffer, *see* [105] at 8, 9, and he offers no evidence to impugn their motives, *id*.

For these reasons, the evidence as a whole would not allow a "reasonable factfinder to conclude" that Defendant retaliated against Plaintiff for his protected activities. *Ortiz*, 834 F.3d at 765. This Court grants summary judgment to Defendant on Plaintiff's retaliation claim.

### C. FTCA/Spoliation

Plaintiff's FTCA spoliation claim arises from Nguyen, Marcotte, and Isaac's alleged alterations of his OJT evaluations and Nguyen's deletion of her emails with Rupp. *See id*. at 16; DSOF ¶ 80; [97-52] at 18–20. Defendant seeks summary judgment on the grounds that: (1) Plaintiff's claim falls within the FTCA's intentional torts exception, and therefore is barred; or (2) Plaintiff's spoliation claim otherwise fails on the merits.[11] [96] at 33, 34.

This Court first notes that the United States is the only proper defendant in an FTCA case. 28 U.S.C. § 2679(a); [96] at 33 n.9. Although this Court can allow a party to amend its pleadings under Federal Rule of Civil Procedure 15(c), courts

---

[11] Defendant also argues that the Rehabilitation Act preempts Plaintiff's spoliation claim. [96] at 34. It is true that the Rehabilitation Act provides "the exclusive remedy for a claim that a federal agency discriminated against a handicapped employee," *McGuinness v. U.S. Postal Serv.*, 744 F.2d 1318, 1322 (7th Cir. 1984), and that appellate courts have found that similar Title VII provisions preempt related claims, *see, e.g.*, *Peuschel v. United States*, 369 F.3d 345, 353 (4th Cir. 2004). But it appears that no court has ruled that the Rehabilitation Act preempts related claims, and this Court will not make new law based upon the undeveloped argument in Defendant's brief. *See United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) ("The parties—not the courts—must research and construct available legal arguments."). Indeed, such arguments are waived. *Id*. The question of the Rehabilitation Act's preemptive force is not as clear-cut as Defendant's cursory treatment of it suggests, *see, e.g.*, *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1155–61 (9th Cir. 2017), and that issue is insufficiently developed here for this Court to properly address it, *see E.E.O.C. v. CEC Entm't*, No. 98-c-698-x, 2000 WL 1339288, at *20 (W.D. Wis. 2000) (citing *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)).

need not permit amendment "where the amendment would be futile." *Arreola v. Godinez,* 546 F.3d 788, 796 (7th Cir. 2008); Fed. R. Civ. P. 15(c)(1)–(2); [7] (designation of Assistant U.S. Attorney); [16] (service executed upon Secretary of Labor). Here, amendment would be futile, since Plaintiff's claim is barred by the United States' sovereign immunity and, in any event, fails on the merits.

The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort." *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (internal quotation marks omitted). This "broad waiver of sovereign immunity is subject to a number of exceptions," including the "intentional tort exception." *Id.* That provision bars suits arising from various intentional torts, including libel, slander, misrepresentation, and deceit. 28 U.S.C. § 2680(h). These exceptions are "mandatory rules of decision," and all such claims are barred by sovereign immunity.[12] *See Williams v. Fleming*, 597 F.3d 820, 823 (7th Cir. 2010), *abrogated on other grounds by Simmons v. Himmelreich*, 136 S.Ct. 1843 (2016).

Courts may examine the "gravamen" of a plaintiff's claim to determine if he asserts an intentional tort claim subject to this bar. *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1012–13 (7th Cir. 1991) (collecting cases and dismissing claim where the plaintiff's allegations sounded in deliberate misrepresentation); *see also Omegbu v. United States*, 475 F. App'x 628, 629 (7th Cir. 2012) (dismissing claim under the intentional tort exception where plaintiff alleged that officials "deliberately falsified information in his file"); *Cannon v. Forest Pres. Dist. of Cook Cnty.*, No. 14-cv-5611,

---

[12] As a brief clarification, this Court notes that in the Seventh Circuit, the question of sovereign immunity is distinct from that of subject matter jurisdiction, contrary to Defendant's assertion. *See Williams*, 597 F.3d at 823. Sovereign immunity, however, serves equally to bar Plaintiff's suit.

2015 WL 921037, at *5 (N.D. Ill. Feb. 26, 2015) (holding that plaintiffs could not pursue FTCA claims arising "out of allegations of deceit or misrepresentation, regardless of how that claim is framed").

Here, despite the generic "spoliation" label, Plaintiff clearly alleges an intentional tort. [33] at 16. His amended complaint states that BLS employees "did not only fail to preserve said evidence, but willfully destroyed evidence and tampered with official government records to distort the true record and cast Plaintiff in a negative light." *Id*. His affidavit states that Nguyen, Marcotte, and Isaac "fabricated errors" in his OJT forms, as part of a "scheme of tampering with and falsifying official records" to support his WIGI denial. [107] at 27; *see also id*. at 24, 28–29. Plaintiff's responses to Defendant's fact statements are replete with references to intentional conduct. *See, e.g.*, R. DSOF ¶¶ 38, 39, 45, 48, 51, 54–56, 58–59. Plaintiff also cites the alleged spoliation to support his retaliation claim, framing it as an intentional, targeted act. *See* [105] at 8.

Despite the clear import of these allegations, Plaintiff now argues in his response brief—in cursory terms, and without citation to law—that "even if some of the actors acted intentionally, there [sic] supervisors can still be deemed negligent for no [sic] taking steps to preserve the evidence." [105] at 11. Again, such "undeveloped arguments" that are "unsupported by pertinent authority" are waived. *Crespo*, 824 F.3d at 674.

Regardless, the "gravamen" of Plaintiff's claim is that BLS employees deliberately tampered with his files, in retaliation for his protected activity and to

justify the disciplinary actions taken against him. *Deloria*, 927 F.3d at 1012. The United States "retains its sovereign immunity with respect to charges of deceit and misrepresentation—regardless of the technical terms in which they are framed," and Plaintiff's spoliation claim is therefore barred. *Id.* at 1013 (collecting cases in which claims alleging that the government negligently mishandled official records were barred by § 2680(h)); *see also Omegbu*, 475 F. App'x at 629 (intentional tort exception bars claims for the "willful mishandling of records").

To the extent that Plaintiff might have asserted a negligent spoliation claim against Defendant, it would also fail on the merits. Under Illinois law, negligent spoliation requires the plaintiff to prove: "a duty to preserve the evidence; breach of that duty by loss of the evidence; that the loss proximately caused the plaintiff's inability to prove his underlying claim; and actual damages as a result." *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 608 (7th Cir. 2016) (citing *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 (Ill. 1995)).

This Court already noted that Plaintiff offers nothing more than speculation in support of his claim that Nguyen, Marcotte, and Isaac altered his OJT evaluations, which does not constitute evidence. *Boss*, 816 F.3d at 919. Nor does Plaintiff offer any evidence or analysis showing that any such alleged tampering proximately caused his inability to prove his underlying Rehabilitation Act claims. *See Schaefer*, 839 F.3d at 608; [105] at 11; *see generally* R. DSOF; PSAF.

Plaintiff's claim also fails as to Nguyen's deletion of her emails with Rupp. First, a duty to preserve evidence only arises if "a reasonable person should have

foreseen that the evidence was material to a potential civil action." *Dardeen v. Kuehling*, 821 N.E.2d 227, 231 (Ill. 2004). Plaintiff does not show that Nguyen should have reasonably foreseen that her emails with Rupp were material to a potential case when she deleted them in late 2013 and early 2014 (months before Plaintiff filed this suit). DSOF ¶ 77; [1]; *see* [105] at 11; *see generally* R. DSOF. Next, Plaintiff fails to show that the lack of Rupp's emails with Nguyen proximately caused his inability to prove his Rehabilitation Act claims, offering neither evidence nor analysis on this point. *See* [105] at 11. Accordingly, Plaintiff also fails to show damages resulting from Nguyen's actions. *See id.*; *Schaefer*, 839 F.3d at 608.

Because Plaintiff fails to prove the necessary elements of his claim, this Court grants Defendant summary judgment on Plaintiff's FTCA spoliation claim. *See Celotex Corp.*, 477 U.S. at 323.

## IV. Conclusion

This Court denies Plaintiff's motion for partial summary judgment [104], and grants Defendant's motion for summary judgment [95]. Judgment is entered in favor of Defendant and against Plaintiff. Civil case terminated.

Dated: March 26, 2018

Entered:

John Robert Blakey
United States District Judge